Filed 6/18/15  In re Sophia G. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| In re SOPHIA G., a Person Coming Under the Juvenile Court Law. | B260461<br>(Los Angeles County Super. Ct. No. DK06513) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JULIE A.,<br><br>    Defendant and Appellant. |  |

APPEAL from the orders of the Superior Court of Los Angeles County, Carlos E. Vazquez, Judge.  Affirmed.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

Julie A. (mother) appeals from a jurisdictional order declaring her daughter, Sophia G., a ward of the court under Welfare and Institutions Code section 300, subdivision (b),[1] as well as a dispositional order removing Sophia from mother's custody and placing her with Elias G. (father). Mother contends substantial evidence does not support the court's jurisdictional findings or Sophia's removal from mother's custody under section 361, subdivision (c). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Sophia first came to the attention of the Los Angeles County Department of Children and Family Services (Department) on May 10, 2014, when mother tested positive for marijuana shortly after Sophia's birth. The Department investigated, provided mother with community resources for parenting, counseling and medication management, and the matter was closed without any formal proceedings.

According to maternal grandparents, mother was diagnosed with bipolar disorder as a teenager. She had taken lithium in the past, but maternal grandparents were unaware of whether mother was still taking any psychiatric medications. Mother claims to have tried a number of psychiatric medications, but they do not work for her. She says she does not trust her doctor because they have never checked her blood levels or taken an EKG.

Mother acknowledged using marijuana since 2007, and that she used it during pregnancy, stating, "When my doctor prescribed it to me he didn't tell me[] it would affect my baby and I did research on it and smoking a little bit will not hurt the baby." She claimed she only took a hit or two for pain in the last months of her pregnancy. She acknowledged continuing to smoke marijuana after Sophia was born, but "[n]ot every day and like four or five hits sometimes." Based on the social worker's interviews, it

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

appears that maternal grandparents minimize the impact of mother's mental illness and marijuana use and focus on their belief that mother would never knowingly harm her child.

Father lives in Downey, and before Sophia was detained, he would see mother and Sophia three or four days a week, including the weekends when mother and Sophia would stay with him. Father reports mother was evicted from her apartment and was homeless for a time when she was eight months pregnant. Mother was at father's house doing laundry, and suddenly began to scream and yell, and punched him on the head.

The Department detained Sophia when she was two months old, after several days of unsuccessfully trying to get mother to cooperate so the Department could determine whether Sophia was at risk of harm. On July 16, 2014, the Department received a referral alleging mother neglected and emotionally abused the baby. When a social worker called mother on the telephone, mother said she felt she was being harassed and that a "peeping tom" called in the referral because the baby was crying. When the social worker tried to confirm mother's address, mother stated she would not come to the door or permit access into the home. Father was concerned because mother was not taking her medications, appeared mentally unstable, and was becoming aggressive. According to father, when he arrived at mother's house to take them to dinner, the baby was crying, hungry and had a soiled diaper. While he was attending to the baby, mother started screaming in an apparent psychotic episode, saying she is not getting help and Sophia was a burden to her. A neighbor called the police, but the police did not file a report because mother had calmed down while talking with them and because father was protecting the baby. Later that evening, however, mother refused to let father take Sophia home with him despite his concerns about mother's "breakdown." He confirmed mother is diagnosed with bipolar disorder and postpartum depression, has refused to take her prescribed medication, and has been having psychotic episodes frequently. He also reported mother used medical marijuana daily while Sophia was in her care.

When the social worker attempted to visit mother at her home, mother refused to permit entry. Instead, she accused the social worker of harassment, stating, "I know my

3

rights and I don't have to let you in." After the social worker persuaded mother to bring Sophia to the door so the social worker could confirm the child was unharmed, the mother said, "I'm a single mom and just because I have a mental health diagnosis does not mean I abuse my kid." When the social worker tried to ask mother about her last visit with her psychiatrist and to show the social worker her prescription for lithium, mother insisted she was not abusing the baby and that she did not have to do anything, and then slammed the door on the social worker. The social worker called mother the next day to try to work with her on ensuring Sophia's safety, but mother responded that this was harassment, she knew her rights, she was unwilling to do anything without a warrant, and then hung up the phone.

When the social worker contacted mother the next day with a warrant for Sophia's removal, mother continued to insist the Department could not do this, but agreed to meet the social worker at the police station. She arrived with a friend, and told the social worker the baby was with maternal grandmother. Mother was very agitated and erratic during the meeting, but agreed to drug test. At one point, mother stated father had her clothes and she had no clothes to wear because he was supposed to wash them. She then pulled a blood-stained pair of underwear from her purse to show the social worker. The social worker called maternal grandmother and informed her there was a warrant for Sophia's detention. Maternal grandmother was cooperative, and Sophia was placed with father on July 19, 2014.

On July 20, 2014, the social worker spoke to mother regarding visitation, and mother reported that if she drug tested on July 21, 2014, marijuana would be in her system. When the social worker asked mother about her lithium prescription, mother first said she did not trust her doctor and claimed lithium could harm her body, but later accused father of taking her pills. She admitted missing an appointment with her psychiatrist on July 18, 2014, because she was stressed out after the social worker's visit. She also claimed father was falsely accusing her of mental instability so he could kidnap Sophia to Ireland. On July 21, 2014, the social worker received four phone calls, six text messages and two emails from mother, expressing escalating concerns that father had

4

taken her clothes and wanting father's passport revoked so he could not take Sophia to Ireland.

At the July 23, 2014 detention hearing, the court ordered Sophia detained from mother and placed with father. The court found father to be a presumed father, and noted that father was not named in the petition. Mother was given visitation, not to be monitored by father.

On July 30, 2014, mother filed a request for a restraining order, accusing father of holding her captive and emotionally abusing her since October 2013. According to mother's declaration, father stole her clothing and property and made the social worker force her to take medications so he could kidnap her daughter and sell her to a couple in Ireland. Father filed a response on August 13, 2014, describing his relationship with mother, including her psychotic episodes and her paranoid delusions. At a scheduled hearing on August 22, 2014, the court took the restraining order request off calendar at mother's counsel's request. On September 9, 2014, mother's counsel notified the court of a complete breakdown in communication with mother, and mother sought a *Marsden*[2] hearing to appoint new counsel.

In a September 10, 2014 interview with a social worker, mother was sometimes confused and disoriented and at other times confrontational. When asked about her mental illness, she acknowledged being diagnosed as bipolar in the past, but claimed now her only issue was allergies to fish and nuts. She accused father of trying to harm her by filling Sophia's diaper bag with peanut dust and peanut oil. She also claimed father had sexually abused Sophia, who was four months old at the time. According to mother, Sophia tried to tell mother about the abuse by touching her genitals and pointing to her genitals.

The court conducted a *Marsden* hearing on September 17, 2014. After removing mother from the courtroom due to an outburst, the court relieved mother's counsel and appointed new counsel to represent mother.

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

5

On October 30, 2014, the Department filed a last minute information report stating that mother's visits with Sophia have been going well, and that mother appeared significantly calmer. Mother reported taking anxiety medication, receiving a psychological evaluation, and signing up for therapy and parenting classes. She agreed to provide paperwork about her enrollments to the Department, but the Department had not received anything from mother.

The court conducted a brief hearing to determine jurisdiction and disposition. The court admitted the Department's reports into evidence; no witnesses were called. The Department, father's counsel and minor's counsel all argued in favor of jurisdiction, while mother's counsel argued each of the petition counts should be dismissed. With respect to disposition, the Department requested that Sophia be placed with father, while mother sought a "home of parents" order. Minor's counsel objected to a home of parents order in light of mother's mental health history and the fact that she had only recently enrolled in a program.

The court sustained counts b-1 and b-3, and also ordered Sophia placed with father, based on clear and convincing evidence of a substantial danger if Sophia was returned to the mother, that there were no reasonable means by which the minor's safety could be protected without removal, and that reasonable efforts had been made to prevent the need for removal.

**DISCUSSION**

**Standard of Review**

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings. [Citations.]" (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) We must uphold the jurisdictional findings if, "after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is substantial

evidence to support the findings." (*In re Monique T*. (1992) 2 Cal.App.4th 1372, 1378.) We resolve all conflicts in support of the determination, examine the record in a light most favorable to the dependency court's findings and conclusions, and indulge all legitimate inferences to uphold the court's order. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379; *In re Tania S*. (1992) 5 Cal.App.4th 728, 733-734.)

## **Jurisdictional Findings**

Mother contends there was insufficient evidence to support the court's exercise of jurisdiction over Sophia. We disagree.

Section 300, subdivision (b)(1), provides a basis for jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left . . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." In order to establish jurisdiction under subdivision (b) of section 300, there must be evidence of (1) neglectful conduct by the parent; (2) causation; and (3) serious physical harm or illness to the minor, or a substantial risk of such harm or illness. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.) Exercise of dependency court jurisdiction under section 300, subdivision (b), is proper when a child is "of such tender years that the absence of adequate supervision and care poses an inherent risk to [his or her] health and safety." (*Id*. at p. 824.) "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child. Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment." (§ 300.2.)

7

Sophia was only two months old at the time of her initial detention, and six months old when the court held an adjudication hearing. Mother's admitted marijuana use before, during, and after her pregnancy, her mental health history, and her long-standing unwillingness to acknowledge and seek treatment for her mental health issues amount to substantial evidence that Sophia would be at risk of harm absent court jurisdiction.

Mother minimizes the risk posed by her marijuana abuse by arguing that she had a medical prescription and the court is not charged with enforcement of drug laws. These arguments are insufficient to overcome the reasonable inference that mother's marijuana use during pregnancy and during Sophia's infancy placed Sophia at risk.

Mother also argues that there was no evidence of *current* risk, because the social worker noted an improvement in her demeanor. Mother's argument ignores the standard of review, which requires us to determine whether there was substantial evidence to support the court's decision, not whether other evidence may have supported a decision to the contrary. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) Even if we presume that mother enrolled in a program and began taking anxiety medication sometime in October 2014, the court was entitled to give more weight to her earlier conduct, particularly without evidence of mother's meaningful participation and progress.

Mother's history of mental health problems, as well as her continued reliance on marijuana, provide substantial evidence that Sophia would be at significant risk of substantial harm if the court did not exercise jurisdiction.

### Dispositional Orders

Mother also contends the order removing Sophia from her custody under section 361, subdivision (c)(1) must be reversed because it was not supported by substantial evidence. We find no error in the court's removal order.

Before a child can be removed from parental custody, the Department must prove, by clear and convincing evidence, "[t]here is or would be a substantial danger to [her]

8

physical health, safety, protection, or physical or emotional well-being . . . if [she] were returned home" and removal is the only reasonable means of protecting they child's physical health.  (§ 361, subd. (c)(1) & (d).)

The law does not require the dependency court to only consider a parent's most recent conduct in deciding whether a child is at risk of detriment such that removal is required.  *(In re John M.* (2012) 212 Cal.App.4th 1117, 1126 ["'The court may consider a parent's past conduct as well as present circumstances'"].)  "'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child.'  [Citation.]"  (*In re N.M.* (2011) 197 Cal.App.4th 159, 169-170.)

In making its jurisdictional findings, the court had already determined that Sophia was at risk of neglect.  Mother contends there were reasonable alternatives to removal, pointing out that she had recently become willing to cooperate in services provided through the Department.  However, mother had previously first failed to follow through with voluntary services provided around the time of Sophia's birth, when mother had tested positive for marijuana.  Again in July 2014, when the social worker was following up on a hotline referral regarding possible neglect, mother refused to allow the social worker into the home.  This, combined with mother's repeated accusations that father and the social worker are colluding to kidnap her child, demonstrate that voluntary services were not a reasonable alternative in this case.

## DISPOSITION

The jurisdictional findings and dispositional orders are affirmed.


KRIEGLER, J.


We concur:


TURNER, P. J.


MOSK, J.

10